In re R.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.M., Respondent-Appellant).

First District (1st Division)   No. 1—87—3800

Opinion filed September 16, 1991.

Randolph N. Stone, Public Defender, of Chicago (Thomas F. Finegan, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Susan Wigoda, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Respondent, the natural mother of R.M., appeals from the termination of parental rights over and appointment of a guardian with rights to consent to adoption of R.M. At issue is whether respondent's unfitness under the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1501 *et seq.*) was sufficiently proved and whether, in that regard, evidence was improperly excluded pertaining to respondent's care of her other child, M.M., R.M.'s natural sister.

We affirm.

R.M. was born on March 18, 1977. On April 15, 1978, R.M. was hospitalized for treatment of several injuries, including a fracture of the left elbow and swelling of the right ear lobe. Evidence of previous fractures was apparent as well. Based, in part, on those injuries, the

Illinois Department of Children and Family Services instituted proceedings for adjudication of wardship as to R.M. (see Ill. Rev. Stat. 1983, ch. 37, par. 704—1). As a result, both R.M. and M.M. were adjudicated wards of the court (see Ill. Rev. Stat. 1983, ch. 37, par. 705—1). M.M. was subsequently returned to respondent's custody following the divorce of respondent and her husband.[1]

Respondent thereafter moved to have custody restored as to R.M., as well. The State, in turn, filed a petition seeking to terminate parental rights over R.M. and to appoint a guardian with the right to consent to adoption (see Ill. Rev. Stat. 1983, ch. 37, par. 705—9). The petition alleged respondent was unfit because she was unable to discharge parental responsibilities because of mental or developmental disabilities as provided in section 1(D)(p) of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1501(D)(p)).

In proceedings pursuant to the State's petition, respondent successfully moved for a directed verdict. On appeal, we determined respondent's motion was improperly granted in view of evidence presented by the State and reversed and remanded the matter. (*In re R.M.* (1st Dist. 1986), No. 83—2151 (unpublished order under Supreme Court Rule 23).) Ultimately, respondent was determined to be unfit and the State's petition was granted.

This appeal followed.

Respondent argues here that, instead of proving respondent's unfitness to discharge parental responsibilities, evidence presented by the State addressed only what was in the best interests of R.M. To that extent, respondent contends, the State failed to establish the requisite disability as set forth in section 1(D)(p) of the Adoption Act.

■ Unfitness of a natural parent under section 1(D)(p) is based on the "inability to discharge parental responsibilities" and must be supported by evidence from a psychiatrist or clinical psychologist. (Ill. Rev. Stat. 1983, ch. 40, par. 1501(D)(p).) The inability to discharge parental responsibilities may be based either on mental impairment or mental illness, terms left undefined under the Adoption Act, or, by cross-reference to, respectively, sections 1—106 and 1—116 of the Mental Health and Developmental Disabilities Code, a developmental disability or mental retardation as defined therein. (Ill. Rev. Stat. 1983, ch. 40, par. 1501(D)(p); Ill. Rev. Stat. 1983, ch. 91½, pars. 1—106, 1—116.) Additionally, "sufficient justification" must exist to be-

---

[1]Respondent's former husband did not participate in any of the adjudicatory proceedings involving R.M. and was defaulted by publication.

lieve that the inability to discharge parental responsibilities will extend "beyond a reasonable time period." (Ill. Rev. Stat. 1983, ch. 40, par. 1501(D)(p).) Where unfitness pursuant to that section has been sufficiently determined (see Ill. Rev. Stat. 1983, ch. 37, par. 705—9), that determination must be affirmed on appeal unless it is contrary to the manifest weight of the evidence. *In re N.F.* (1989), 178 Ill. App. 3d 662, 533 N.E.2d 952, *appeal denied* (1989), 126 Ill. 2d 559, 541 N.E.2d 1108.

Sufficient evidence existed in the instant case to support the determination that respondent was unfit. Testimony of two experts established that respondent suffered from a mental impairment or mental illness which rendered her unable to care for R.M. as a parent.

Dr. Robert Galatzer-Levy, a psychiatrist and psychoanalyst, testified based on interviews he conducted with respondent alone and with respondent when R.M. was present. He spoke with respondent about a number of issues, including the physical care of R.M. Respondent felt that R.M. should be in her custody because she was R.M.'s biological mother. In that regard, respondent had made the peculiar remark that R.M. should eat the food of respondent's ethnic descent. Galatzer-Levy indicated the remark was meant literally.

When asked about temper tantrums R.M. had exhibited, including episodes of "head banging" against her crib, and how respondent would respond to such situations, respondent simply answered that the problems arose because R.M. was not in respondent's, her biological mother's, care. To Galatzer-Levy, that response evidenced a gross misunderstanding of R.M.'s psychological state and respondent's incapacity to understand R.M.'s condition. Galatzer-Levy indicated respondent was unable to understand R.M.'s physical condition as well. He stated that pediatricians had advised respondent that R.M. was allergic to dogs and cats and would have a physical reaction if exposed to them. However, respondent remarked that she did not "believe in that stuff."

Galatzer-Levy stated respondent suffered from a "borderline personality disorder" and thereby lacked the capacity to care for R.M. He described the disorder as both severe and chronic, affecting all areas of personality. The disorder impairs the ability to understand and comprehend emotional states of others such that the individual afflicted lacks the capacity to empathize, generally. Under stress, the individual cannot tell what is real from what is not. Morality is impaired to the extent that matters are viewed exclusively in terms of the individual's own immediate needs. Injustice done to others cannot be comprehended.

However, Galatzer-Levy testified, the disorder would not impair respondent's ability to care for herself on a day-to-day basis and might not affect respondent's care for another child who did not exhibit the same psychiatric condition suffered by R.M. But the fact that respondent might be able to so care for another child did not indicate respondent would be able to care for R.M. While he considered the condition treatable, treatment would involve intensive psychotherapy in a hospital setting, four to six times per week, for four to seven or more years and the prognosis was not good. Thus, it was Galatzer-Levy's opinion that, as of that time and for the foreseeable future, respondent's condition precluded her from caring for R.M. as a parent. Further, he stated he could not envision circumstances likely to alter that determination.

Dr. Nev Littner, a child psychiatrist, testified based upon his examination of various reports, including those of Dr. Robert Galatzer-Levy, as well as interviews with R.M. and R.M.'s foster parents. Littner was aware that respondent was diagnosed as suffering from a borderline personality disorder. Littner's own explanation of the disorder was that it was a behavioral state between "the lowest limit of neurosis and the limit of psychosis" in which stress could trigger a psychotic episode.

Consistent with Galatzer-Levy's opinion, Littner stated it was possible that a person suffering from that disorder might be capable of caring for one child but incapable of caring for another. That possibility, however, did not alter Littner's conclusion that respondent's disorder rendered her incapable of understanding or meeting the needs of R.M. and, therefore, incapable of mothering R.M. He explained that a woman suffering from such a disorder might react differently to one child "because of what that one child reminds her of and stirs up in her" than to another child.

The opinions of Galatzer-Levy and Littner, above, support the determination that respondent suffered from a mental impairment or mental illness which rendered her unfit under section 1(D)(p) of the Adoption Act to care for R.M. Further, Galatzer-Levy's testimony regarding the effort and length of time needed to treat respondent's disorder sufficiently established that respondent's inability to discharge parental responsibilities over R.M. would continue beyond a reasonable time. We therefore find no reason to disturb the judgment of the circuit court.

Respondent also contends that by sustaining the State's objections to respondent's counsel's questions regarding respondent's care of her other daughter, M.M., the trial judge improperly excluded evi-

dence that respondent was capable of caring for R.M. Respondent's attorney was permitted to make offers of proof as to the issue of the care of M.M.

In *In re M.C.* (1990), 201 Ill. App. 3d 792, 559 N.E.2d 236, we addressed the identical argument, ruling that the preclusion of testimony as to the care rendered to one child is irrelevant to the determination of the fitness to care for another child. For the same reason, the preclusion of testimony in the instant case concerning respondent's care of M.M. cannot constitute an abuse of discretion because such testimony would be irrelevant as to the care of R.M.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.